UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-cv-24639-BLOOM/O'Sullivan

TROY ANDERSEN,

    Plaintiff,
v.

ROYAL CARIBBEAN CRUISES LTD.,

    Defendant.
_____/

## ORDER DENYING MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court on Defendant's Motion for Summary Judgment, ECF No. [82] (the "Motion"). The Court has considered the Motion, all opposing and supporting submissions, the record in the case, the applicable law, and is otherwise fully advised. For the reasons that follow, the Motion is denied.

**I.    BACKGROUND AND UNDISPUTED FACTS**

This case arises out of injuries Plaintiff Troy Andersen ("Plaintiff") sustained when he slipped and fell in water that came through the ceiling of his cabin suite while on Defendant Royal Caribbean's ("Defendant") cruise ship. The following facts are undisputed, unless otherwise indicated.

    A.  <u>The Incident</u>

On November 17, 2018, at or about 2:30 p.m., Plaintiff, his wife, and daughter were in their two-level passenger cabin suite located on Deck 17 aboard Defendant's cruise ship, the *Harmony of the Seas*. ECF No. [81] ¶ 1; ECF No. [90] ¶ 1; ECF No. [1] ¶¶ 8, 10; ECF No. [81-5] at 2; ECF No. [81-1] at 13, 17.] The following is Plaintiff's account of the incident: Plaintiff and his wife were in the upstairs part of the suite, while his daughter, Gabby, was in the downstairs

part of the suite. [Pl.'s Dep. at 65:7-20, ECF No. [81-1] at 17.[1] Gabby yelled, "Papa, there's water pouring out of the ceiling." *Id.* at 65:21-22. Plaintiff then "stood up and . . . looked over the balcony . . . and could see the water pouring out of the sprinkler" or something resembling a sprinkler on the lower part of the downstairs ceiling. *Id.* at 65:22–66:20. Plaintiff likened the leak to water coming out of a faucet. *Id.* at 66:21-23, 70:10-11.

Upon seeing the water coming from the ceiling, Plaintiff immediately grabbed an eight- to ten-inch ice bucket and put it under the pouring water, then "dialed the number that's on the phone for Guest Services." *Id.* at 67:1-12, 77:14-18. Plaintiff called Guest Services twice. *Id.* at 68:5. The first time, the phone rang approximately eight times and there was no answer. *Id.* at 68:4-15. Plaintiff then hung up and immediately called Guest Services again—the phone rang five to eight times, then stopped, "like somebody picked up and just put [the phone] down or picked up [and] put [him] on hold." *Id.* at 68:16-23.

Throughout the course of the incident, Plaintiff walked from his suite to the Suite Lounge (located approximately 150 feet from his suite) and back three times. *Id.* at 59:13-15, 95:23-97:7. Because Guest Services was not responding to Plaintiff's phone calls, he "immediately went down to the Suite Lounge" and "spoke with Oscar . . . the bartender in the Suite Lounge because there was nobody at the concierge desk." *Id.* at 68:24-69:7. Plaintiff told Oscar about the water and Oscar told Plaintiff he would get help right away. *Id.* at 69:11-20. Plaintiff saw Oscar pick up the phone and call someone. *Id.* at 69:18-20.

Plaintiff went back to his suite, where the ice bucket was overflowing with water. *Id.* at 69:19-23. Plaintiff and Gabby "dumped the ice bucket" in the bathroom sink and "started laying

---

[1] Defendant attaches Plaintiff's deposition transcript to its Statement of Material Facts and copies and pastes portions of the transcript to its Statement of Material Facts. ECF No. [81] ¶ 3; ECF No. [81-1].

2

towels down." *Id.* at 70:1-3, 75:6-8. Plaintiff, who was wearing canvas loafers with rubber soles, stepped on the wet towels as he was laying them down. *Id.* at 75:17–76:10. Plaintiff waited twenty-five minutes (during which time the ice bucket did not make a difference so he moved it and put a bathrobe in its place), then he and Gabby went to the Suite Lounge a second time to ask Oscar for help again. *Id.* at 76:14–76:13. On his second trip to the Suite Lounge, Plaintiff "[w]alked across the wet towels" as well as some tile flooring. *Id.* at 79:8–80:10. Plaintiff again asked Oscar for help, and Oscar said he would call maintenance again. *Id.* at 80:18–81:2. Plaintiff heard Oscar on the phone saying, "There's a leak in the cabin and somebody needs to get up there." *Id.* at 80:24-25. Oscar then told Plaintiff someone was on the way to his suite. *Id.* at 81:8.

Plaintiff and Gabby went back to the suite. *Id.* at 81:16-18. The water was still coming down. *Id.* at 81:21. Plaintiff's wife threw more towels down and laid them down to soak up the water. *Id.* at 81:22-24.

Another twenty-five minutes passed with no assistance from Defendant. *Id.* at 82:3-8. Meanwhile, water "started pouring out of the vent directly in front of the bathroom door . . . like a shower . . . water was coming through . . . the vent cover." *Id.* at 82:6–83:7. Plaintiff made another attempt to lay more towels down, then went back to the Suite Lounge a third time; he was able to walk around the shower-like water coming through the vent. *Id.* at 84:1-25. When he got to the Suite Lounge for the third time, Plaintiff told Oscar that it was getting worse, that no one had come, and that he needed help. *Id.* at 85:16-24. There were two other crewmembers, who Plaintiff believed to work for the Suite Lounge restaurant, standing with Oscar. *Id.* at 86:2-5. Oscar appeared to pick up the phone and make another call. *Id.* at 86:7-9. One of the other crewmembers went to the kitchen and returned with another crewmember, a man who wore a suit. *Id.* at 86:10-13. The suit-wearing crewmember walked down to the suite with Plaintiff, looked into the suite,

and saw the water coming out of the ceiling. *Id.* at 87:9-11. The suit-wearing crewmember then got on his radio and said, "Someone needs to get up to the room – the 17th floor." *Id.* at 87:13-25. The suit-wearing crewmember then left Plaintiff's suite without saying or doing anything else. *Id.*

Plaintiff then went back inside the suite. *Id.* at 88:1-2. Gabby expressed concern that her clothes and suitcases were about to be destroyed from the spreading water, so Plaintiff decided to step across the room to "grab her stuff." *Id.* at 88:14-18. Water was still coming out of the vent at this point. *Id.* at 112:8-12. Plaintiff pushed some of the towels, which he had laid down to soak up the water, toward the bathroom. *Id.* at 88:19-22. Plaintiff bent over and grabbed some of Gabby's belongings, then turned. *Id.* at 88:23-24. As soon as Plaintiff turned, his right foot slipped and went right under the bathroom door and got jammed between the floor and the door, causing him to fall backwards in the hallway toward the bathroom. *Id.* at 89:1-5. The water had been leaking in the suite for "at least one hour" prior to Plaintiff's fall. *Id.* at 190:25–191:8.

As a result of the incident, Plaintiff sustained the following injuries: a torn right bicep, torn right ankle ligaments, and nerve damage to his right leg between his knee and ankle. *Id.* at 27:13–28:11, 31:15-21. He has no feeling on part of his right foot, as well as numbness going up and down the side of this right leg. *Id.* at 32:5-25. Plaintiff has undergone three surgeries: one to reattach his bicep to his labrum, and two on his ankle and leg. *Id.* at 35:1-7, 37:1-6, 40:14-20.]

    B.  <u>Vinyl Tile Floor</u>

The floor on which Plaintiff fell is Luvanto FR Marine Luxury Vinyl Tile, manufactured by Ovation Interior Flooring Design Limited. ECF No. [81] ¶ 5; ECF No. [90] ¶ 5; ECF No. [81-3] at 11; ECF No. [81-4] at 6; ECF No. [81-2] (photograph of floor in suite). There is no evidence of prior slip and fall incidents on Luvanto FR Marine luxury flooring in Defendant's fleet of vessels. ECF No. [81] ¶ 6; ECF No. [90] ¶ 6.

Plaintiff's flooring expert, Srinivas Kadiyala, Ph.D. ("Dr. Kadiyala"), an engineer and certified tribometrist, conducted two inspections: first of commercially available Luvanto FR Marine Luxury Vinyl Tile, and then of the suite where the incident occurred. ECF No. [81-4] (Dr. Kadiyala's 11/11/20 Rule 26(a)(2)(B) report, made after he was denied access to the vessel due to COVID-19); ECF No. [81-5] (Dr. Kadiyala's 02/26/21 supplemental report, made after he inspected the vessel in person). Dr. Kadiyala tested the slip resistance of the vinyl tile floor in the suite. ECF No. [81-5] ¶¶ 9–12; ECF No. [81-4] ¶ 29. He reported that:

> Slip resistance is not an observable condition, therefore whether a surface is visibly wet or not does not indicate the relative slip resistance. Required Coefficient of Friction (RCOF) is defined as the minimum coefficient of friction required by a pedestrian to ambulate without slipping and is different from the Available Coefficient of Friction (ACOF) offered by walking surface. <u>If the available Coefficient of Friction at the surface exceeds the Required Coefficient of Friction, no slip will occur. However, if there is insufficient available Coefficient of Friction, a slip will more likely occur</u>. It is well understood in human study of slip (Exhibit 3 – No. 20) that there is wide intersubject variability in utilized COF values which suggests that minimum threshold levels used to define "safe" walkway surfaces should consider not only average utilized COF values, but also the range of values used by individual subjects. . . . A walkway surface is considered safe when the [ACOF] of the walkway surface is greater than the [RCOF] of the pedestrian ambulating on the walkway surface under the prevailing conditions.

ECF No. [81-4] ¶¶ 29-30 (emphasis in original).]

According to Dr. Kadiyala, to meet industry safety standards, "walking surfaces shall have a nonskid surface sufficient to provide a coefficient of friction (COF) of **0.6 or higher** measured when the surface is wet." ECF No. [81-4] ¶ 40 (citing ASTM F1166-07 (Reapproved 2013), Standard Practice for Human Engineering Design for Marine Systems, Equipment, and Facilities, Section 11.12.1.2) (emphasis added). Dr. Kadiyala's test measured a "wet slip index was **0.43-0.64**." ECF No. [81-5] ¶ 11 (emphasis added).] "In the presence of water, some measured locations demonstrate a significant drop in slip resistance (~29%) whereas in other areas there was no change in slip resistance." *Id.* ¶ 12. As such, Dr. Kadiyala opined that the vinyl tile flooring in Plaintiff's

5

suite fails to meet minimum safety criteria for slip resistance and that "the proximate cause of [Plaintiff's] slip and fall was the failure to maintain a slip-resistant walking surface under reasonably foreseeable conditions." ECF No. [81-4] ¶¶ 40, 71, 84, 85; ECF No. [81-5] ¶ 17.

    C. <u>Defendant's HVAC System</u>

Defendant's official position is that a clogged drain in the suite's heating, ventilation, and air conditioning (HVAC) system caused the leak. ECF No. [90] ¶ 19; ECF No. [92] ¶ 19.] Defendant provides air conditioning ("a/c") in each cabin on all ships in its fleet and is solely responsible for maintaining its HVAC system. ECF No. [90] ¶¶ 10, 11; ECF No. [92] ¶¶ 10, 11. Clogged HVAC unit issues sometimes occur in the Oasis class of vessels (the class of vessels to which the *Harmony of the Seas* belongs). ECF No. [90] ¶ 18; ECF No. [92] ¶ 18. Defendant's corporate representative, Kjell Larsen ("Larsen"), testified that the rule onboard the vessel is to respond to any passenger maintenance complaint with respect to an a/c as quickly as possible or within a half-hour, depending how busy the maintenance workers are. ECF No. [90] ¶ 23; ECF No. [92] ¶ 23. According to Larsen, if flooding is present, "then you have to send somebody immediately." ECF No. [90] ¶ 24; ECF No. [92] ¶ 24.

An overflowing drip pan indicates that the a/c drain is clogged up. ECF No.[90] ¶ 26; ECF No. [92] ¶ 26. Defendant does not use biocides to help prevent a/c unit pipes from clogging. ECF No. [90] ¶ 30; ECF No. [92] ¶ 30] There are two factors that lead to increased humidity (and thus an increased chance of clogs and leaks) in the Loft Suites such as Plaintiff's suite: the presence of a shower in the bathroom near the a/c vent in the hallway; and the fact that the suites have outdoor balconies and the doors are often left open, introducing more humidity. ECF No. [90] ¶ 31; ECF No. [92] ¶ 31.

Plaintiff contends, based on the opinion of his HVAC expert, mechanical engineer Rene I. Basulto ("Basulto"), that Defendant's a/c maintenance protocol violates standards established by the Building Owners and Management Association International ("BOMA"), whose standards apply to the *Harmony of the Seas*. ECF No. [90] ¶ 32; ECF No.[92] ¶ 32; ECF No. [87-3] at 4. According to Basulto: (1) BOMA standards require the condensate drain to be checked and flushed with biocide quarterly; (2) Defendant's a/c maintenance system is comprised solely of changing the a/c filters on a quarterly basis; (3) Defendant did not blow out the a/c pipe on a quarterly basis; (4) Defendant did not clean the drain pan or use biocide; and (5) the more humid the environment, the more condensate the a/c system generates, leading to more biological growth in the pan and a/c system. ECF No. [90] ¶¶ 33-39; ECF No. [92] ¶¶ 33-39. Defendant disputes Basulto's opinion, "which is rebutted by Defendant's expert." *Id.*

### D. Procedural Background

Plaintiff filed suit on November 8, 2019 for "negligent maintenance and selection of flooring" (Count I) and "negligence: failure to reasonably and properly warn" (Count II). ECF No. [1] ¶¶ 15-39. In the instant Motion, Defendant argues it is entitled to summary judgment because (1) the wet floor was open and obvious, negating Defendant's duty to warn; (2) Defendant was not on notice that the wet floor was unreasonably slippery; and (3) there is no evidence that the floor was negligently maintained or selected. ECF No. [82]. Plaintiff contends that Defendant is negligent for maintaining slippery tile floors in its suite cabins, maintaining a dangerous air conditioning maintenance program, and ignoring actual notice of the leaking water in Plaintiff's suite for over an hour. ECF No. [89]. The Motion is ripe for disposition.

## II.     LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record, including, among other things, depositions, documents, affidavits, or declarations. Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United* States, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

A court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations, which 'are jury functions, not those of a judge.'" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019) (quoting *Feliciano v. City of Mia. Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990).

Initially, the moving party bears the "responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *see also Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 322). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Yet, even where a non-movant neglects to submit any alleged material facts in dispute, a court must still be satisfied that the evidence in the record supports the uncontroverted material facts proposed by the movant before granting summary judgment. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008). Indeed, even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

In resolving the issues presented under Rule 56, "the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)). Moreover, summary judgment is inappropriate where the Court would be required to weigh conflicting renditions of material fact or determine witness credibility. *See, e.g.*, *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993); *Mize v. Jefferson City Bd. of Educ.*,

93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

### III. DISCUSSION

#### A. Maritime Law Principles

"Federal maritime law applies to actions arising from the alleged torts committed about a ship sailing in navigable waters." *Smith v. Royal Caribbean Cruises, Ltd.*, 620 F. App'x 727, 729 (11th Cir. 2015) (citation omitted). "In analyzing a maritime tort case, we rely on general principles of negligence law." *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980). Accordingly, to establish a maritime negligence claim, a plaintiff must show that:

(1) the defendant had a duty to protect the plaintiff from a particular injury;
(2) that defendant breached that duty;
(3) the breach actually and proximately caused the plaintiff's injury; and
(4) that plaintiff suffered actual harm.

*Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012) (citations omitted). "Each element is essential to Plaintiff's negligence claim and Plaintiff cannot rest on the allegations of her complaint in making a sufficient showing on each element for the purposes of defeating summary judgment." *Isbell v. Carnival Corp.*, 462 F. Supp. 2d 1232, 1236–37 (S.D. Fla. 2006).

"A cruise-ship operator 'is not liable to passengers as an insurer, but only for its negligence.' The mere fact of an accident causing injury is insufficient to establish that a dangerous condition existed." *D'Antonio v. Royal Caribbean Cruise Line, Ltd.*, 785 F. App'x 794, 796-97 (11th Cir. 2019) (quoting *Keefe*, 867 F.2d at 1322). Rather, "[u]nder maritime law, the owner of a ship in navigable waters owes passengers a duty of reasonable care under the circumstances." *Sorrels v. NCL (Bah.) Ltd.*, 796 F.3d 1275, 1279 (11th Cir. 2015). "In other words, a cruise ship operator's duty is to shield passengers from known dangers (and from dangers that should be

known), whether by eliminating the risk or warning of it." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1178 (11th Cir. 2020). Thus, a cruise-ship operator's liability often "hinges on whether it knew or should have known about the dangerous condition." *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 720 (11th Cir. 2019).

### B. Negligent Failure to Warn (Count II)

Defendant's argument in favor of summary judgment on Count II is two-fold: first, because the wet floor was open and obvious, Defendant did not have a duty to warn Plaintiff that the floor would become slippery when wet; and second, Defendant was not on notice that the floor was unreasonably slippery when wet.

#### i. There is Evidence that the Dangerous Condition was not Open and Obvious.

"The duty to warn in the maritime tort context extends to only known dangers which are not apparent or obvious." *Smith v. Royal Caribbean Cruises, Ltd.*, 620 F. App'x 727, 730 (11th Cir. 2015). Open and obvious conditions are "discernable through common sense and the ordinary use of eyesight." *Lancaster v. Carnival Corp.*, 85 F. Supp. 3d 1341, 1344 (S.D. Fla. 2015); *see also Smith*, 620 F. App'x at 727, 730 (defendant did not have a duty to warn plaintiff not to swim in murky green pool water because the danger was open and obvious); *Aponte v. Royal Caribbean Cruise Lines Ltd.*, 739 F. App'x 531, 537 (11th Cir. 2018) (reversing district court's finding that a puddle of soap in a bathroom was open and obvious because plaintiff's testimony that the puddle was "clearish" and that he did not see the puddle presented a genuine issue of material fact; "the fact that the puddle of soap was capable of being observed does not necessarily make it open and obvious to a reasonable person"). The alleged open and obvious nature of a condition is assessed based on "what an objectively reasonable person would observe" under the circumstances and thus

is ordinarily a question of fact. *Carroll v. Carnival Corp.*, 955 F.3d 1260, 1264 n.1 (11th Cir. 2020) (citing *Horne v. Carnival Corp.*, 741 F. App'x 607, 609 (11th Cir. 2018)).

The dangerous condition at issue is the slipperiness of the vinyl tile floor in the hallway of Plaintiff's suite when wet. ECF No. [89] at 8-11; *see also* ECF No. [1] ¶ 29. The issue is "whether a reasonable person would have observed the [vinyl tile floor's] wetness and *appreciated its resultant slickness*." *Frasca v. NCL (Bahamas) Ltd.*, 654 F. App'x 949, 952 (11th Cir. 2016) (emphasis added).

Defendant argues that the wet floor was open and obvious to Plaintiff because Plaintiff notified Defendant of the water, placed a bucket down to collect the water and, when that overflowed, he placed towels down. When the towels and the soles of his feet, he decided to walk in the area. ECF No. [82] at 4-5. Further, Defendant contends, Dr. Kadiyala's opinion that the vinyl tile floor's COF range was between 0.43 and 0.64 does not satisfy Plaintiff's burden of establishing that the floor was insufficient, with insufficient meaning a COF range of below 0.6.[2] ECF No. [82] at 5-6; ECF No. [81-4] ¶ 40. Defendant's argument fails because there is evidence that the slipperiness of the floor was unreasonable and was not open and obvious.

The Eleventh Circuit's opinion in *Frasca v. NCL (Bahamas) Ltd.*, 654 F. App'x 949, 952–53 (11th Cir. 2016) is instructive. The court in *Frasca* reversed the district court's grant of summary judgment in favor of the defendant because there were genuine issues of material fact as

---

[2] "In slip and fall cases involving an allegedly dangerous or defective surface, the question of liability sometime turns on (or is at least informed by) the surface's coefficient of friction (COF), which is in layman's terms, 'the degree of slip resistance.'" *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1278–79 (11th Cir. 2015) (quoting *Mihailovich v. Laatsch*, 359 F.3d 892, 896, 921, n.2 (7th Cir. 2004)). In *Sorrels*, the Eleventh Circuit relied upon the *Shorter Oxford English Dictionary* definition of coefficient of friction as "the ratio between the force necessary to move one surface horizontally over another and the normal force each surface exerts on the other." *Id.* at 1279. Thus, whenever there are allegations of a dangerous or defective surface, the COF, or slip resistance, test explains the movement of one condition (i.e., water) over another condition, (i.e., a slippery floor).

to the unreasonable slipperiness of a wet deck. *Id.* There, the plaintiff, a cruise ship passenger who slipped and fell in a puddle on an outdoor deck, observed that the well-lit deck was "wet and shiny" with "puddles of water" on its surface. *Id.* at 952. The district court concluded that based on those conditions, a reasonable person would have observed the deck to be slicker than usual. *Id.* But the district court failed to appreciate the plaintiff's expert's report:

> Importantly, however, Plaintiff introduced an expert's report suggesting that the deck in question is unreasonably slippery when wet. The report suggests that a reasonable person would have known that the deck would be slippery, but not as slippery as it actually was. A jury could credit the expert's testimony and conclude that the deck's visible wetness and the weather conditions would not alert a reasonable observer to the extent of the deck's slipperiness. . . . Given these facts, a reasonable jury could conclude that the degree of slipperiness on the deck was not open and obvious. Thus, Plaintiff has raised a genuine issue of material fact as to that issue.

*Id.* at 952-53; *see also Petersen v. NCL (Bahamas) Ltd.*, 748 F. App'x 246, 250-51 (11th Cir. 2018) (reversing summary judgment for cruise ship in slip and fall case and holding that "although the wetness of the deck was open and obvious, the unreasonably slippery state of the deck may not have been open and obvious to a reasonable person").

Here, while the wetness of the floor may have been open and obvious to Plaintiff, there is evidence that the slipperiness of the floor was both unreasonable and not open and obvious. *Id.*; *Frasca*, 654 F. App'x at 952-53. Wetness is not the same thing as unreasonable slipperiness, despite Defendant's apparent argument to the contrary. ECF No. [82] at 4-5. As in *Frasca*, the factfinder could credit Dr. Kadiyala's expert opinion that the vinyl tile floor in Plaintiff's suite was unreasonably slippery when wet, such that the danger was not open and obvious to a reasonable person. Dr. Kadiyala's test measured a "wet slip index [of] 0.43-0.64," which is below the 0.60 maritime minimum safety threshold, with a "significant drop in slip resistance [in some areas and] no change in slip resistance" in others. ECF No. [81-5] ¶¶ 11, 12; ECF No. [81-4] ¶ 40. Further,

13

Dr. Kadiyala reported that "slip resistance is not an observable condition, therefore whether a surface is visibly wet or not does not indicate the relative slip resistance." ECF No. [81-4] ¶ 29.

Defendant asserts that because the area tested had a range of 0.43 to 0.64, and because 0.64 is greater than 0.60, there is no evidence to support the allegation that the floor is unreasonably slippery. ECF No. [82] at 5. However, Dr. Kadiyala opined that the lack of "uniform slip resistance fails to meet specific minimum safety criteria," ECF No. [81-4] ¶ 84, and that the wide COF range itself is dangerous and not obvious:

> The exemplar flooring material as tested is particularly hazardous due to the failure to provide a uniform slip-resistance walking surface under foreseeable conditions of use. The hazard is not readily apparent especially to the cruise passengers walking around the hallway of the subject Crown Loft Suite area due to:
> (a) competition for attention from the primary task of trying to save their belongings from getting wet from a leak in their room.
> (b) the difference in slip resistance characteristics between adjacent wet and dry walkway flooring surface made from the same material.

ECF No. [81-4] ¶ 68. Further, Dr. Kadiyala opined, "Although it is possible that a wet appearance of the flooring may be visible to pedestrians, the non-uniform variation of slip-resistance of the subject dark colored flooring surfaces is not a visible characteristic and increases the risk of slip and fall incidents. *Id.* ¶ 83.

Accordingly, Dr. Kadiyala's opinions and data raise a genuine issue of material fact as to whether the vinyl tile floor was unreasonably slippery such that it was not open and obvious to a reasonable person.

### ii. Notice

"Regarding the breach element, 'the benchmark against which a shipowner's behavior must be measured is ordinary reasonable care under the circumstances, a standard which requires, as a prerequisite to imposing liability, that the carrier have had actual or constructive notice of the risk-creating condition . . . .'" *Frasca*, 654 F. App'x at 952 (quoting *Keefe v. Bahama Cruise Line*,

Inc., 867 F.2d 1318, 1322 (11th Cir. 1989)). "[A] cruise ship operator's liability hinges on whether it knew or should have known about the dangerous condition." *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 721 (11th Cir. 2019) (citation and quotation marks omitted). "Knowledge that the condition exists is not sufficient, the defendant must also know that the condition is dangerous. We cannot automatically impute awareness of the danger just because the defendant created the condition." *Malley v. Royal Caribbean Cruises Ltd.*, 713 F. App'x 905, 908 (11th Cir. 2017).

Defendant argues that there is no evidence it had actual or constructive notice that "the floor itself was dangerous" or "that the floor was unreasonably slippery" because: (1) there is no evidence of prior slip and falls in Plaintiff's suite, (2) there is no evidence of prior slip and falls on Luvanto FR Marine luxury flooring in Defendant's fleet, and (3) there is no evidence that Defendant knew that the vinyl tile floor in Plaintiff's suite was unreasonably slippery. ECF No.[82] at 6.

Defendant admits it had actual notice of the water leak from Plaintiff's suite. ECF No. [90] ¶ 17; ECF No. [92] ¶ 17. The issue is whether Defendant knew or should have known that water would cause the vinyl tile floor to become unreasonably slippery and dangerous.

Defendant's arguments that, because there were no prior similar incidents, it did not know and should not have known that the vinyl tile floor would become unreasonably slippery when wet, is unavailing. The Eleventh Circuit has made clear that there are other available sources of constructive notice evidence besides prior similar incidents. *See, e.g.*, *Jones v. Otis Elevator Co.*, 861 F.2d 655, 661-62 (11th Cir. 1988) ("We have held that 'evidence of similar accidents might be relevant to the defendant's notice . . . ."); *see also Thomas v. NCL (Bahamas), Ltd.*, 203 F. Supp. 3d 1189, 1192-93 (S.D. Fla. 2016). "A maritime plaintiff can establish constructive notice with evidence that the defective condition existed for a sufficient period of time to invite corrective

15

measures." *Guevara*, 920 F.3d at 721 (citation omitted); *see also Plott v. NCL Am., LLC*, 786 F. App'x 199, 200 (11th Cir. 2019). *Plott* involved a passenger's slip and fall in a puddle on a staircase on the defendant's cruise ship. 786 F. App'x at 201. The Eleventh Circuit in *Plott* held that the district court erred in granting summary judgment because genuine issues of material fact remained as to whether the defendant had notice that the floor where the accident occurred was wet. *Id.* at 202-03. "[A] reasonable factfinder could conclude that [nearby] crewmembers knew or should have known about the . . . wet floor and should have either removed he hazard or warned [plaintiff] of it." *Id.* at 203. Similarly, here, a reasonable factfinder could conclude that the suit-wearing crewmember who observed the water pouring from the ceiling and wet towels on the floor in Plaintiff's suite, made a call, then left the suite without saying anything should have warned Plaintiff to step away from the water. Pl. Dep. at 87:9–25. A reasonable factfinder might also conclude that Plaintiff's three requests for help from Oscar should have led Oscar or another crewmember to warn Plaintiff to leave the wet area.

In addition, evidence that an allegedly dangerous condition failed to comply with industry safety standards, together with other evidence of notice, can be used to establish constructive notice. *See Bunch v. Carnival Corp.*, 825 F. App'x 713, 715-16 (11th Cir. 2020); *see also Sorrels*, 796 F.3d at 1282 (citing ASTM F1166-07, the regulation that Dr. Kadiyala relies upon, and stating that "evidence of custom within a particular industry, group, or organization is admissible as bearing on the standard of care in determining negligence . . . Compliance or noncompliance with such custom, though not conclusive on the issue of negligence, is one of the factors the trier of fact may consider in applying the standard of care.") (citation and internal quotation marks omitted). Here, Dr. Kadiyala opined that the suite's vinyl tile flooring did not comport with industry safety standards. ECF No. [81-4] ¶ 40; ECF No. [81-5] ¶ 11. In addition, Basulto (Plaintiff's HVAC

expert) opined that Defendant's a/c maintenance protocol violates industry standards. ECF No. [90] ¶ 32; ECF No. [92] ¶ 32; ECF No. [87-3] at 4. A reasonable factfinder might conclude that evidence of Defendant's non-compliance with HVAC industry standards, evidence of Defendant's non-compliance with industry standards relating to its vinyl tile floors, and the fact that the leaking water existed for approximately one hour and multiple crewmembers knew about it, should have put Defendant on constructive notice of the risk-creating condition (i.e., that the vinyl tile floors would become unreasonably slippery when wet).

In sum, there is a genuine dispute of material fact as to notice. Therefore, the Court cannot conclude as a matter of law that Defendant was not on notice of the dangerous condition. Summary judgment on Count II is denied.

C. <u>Negligent Maintenance and Selection of Flooring (Count I)</u>

As to Count I, Plaintiff's Complaint alleges that Defendant negligently failed to clean and maintain safe flooring despite having approximately one hour to address the hazard, negligently selected the flooring because it is not sufficiently slip resistant, and negligently failed to maintain the HVAC system in Plaintiff's suite. ECF No. [1] ¶ 26]. However, Plaintiff's later briefing appears to abandon these conflated theories[3] and simply argues that Defendant is liable for negligently maintaining the flooring. ECF No. [89] at 11-16. Defendant asks the Court to grant summary judgment on Count I because Dr. Kadiyala provides no opinion on the maintenance of the floor, and simply opines that the floor was unfit for its intended purpose based on the COF test he performed. ECF No. [82] at 8-9. Defendant's argument fails.

---

[3] Plaintiff improperly conflates a negligent maintenance claim with a negligent selection claim. *See Frasca*, 654 F. App'x at 955 n.8. "The evidence needed to prevail under these theories is different, as is the evidence necessary to withstand summary judgment." *Id.*

17

With respect to a negligent maintenance claim, the "shipowner may still be liable for maintaining a dangerous condition even if the danger was obvious." *Amy v. Carnival Corp*., 961 F.3d 1303, 1308 (11th Cir. 2020). But for the plaintiff to prevail, notice that the shipowner was aware of should have been aware of the dangerous condition is still required. *Id.* (recognizing that notice is material to both negligent maintenance and failure to warn claims); *Guevara*, 920 F.3d at 723 (affirming district court's grant of summary judgment in favor of cruise line because there was no evidence of constructive notice in the form of passenger complaints or reported issues about the relevant lighting, and plaintiff failed to make a sufficient showing that the dangerous condition was present long enough to invite corrective measures).

For the reasons explained *supra*, there is a genuine issue of material fact as to whether Defendant was on notice of the dangerous condition of the floor. Moreover, the Eleventh Circuit has determined that summary judgment is improper on negligent maintenance theories where the district court fails to take into account expert testimony that the cruise line's maintenance of a particular condition violated industry standards. *Carroll*, 955 F.3d at 1269-70 (reversing district court's grant of summary judgment because the court failed to consider an expert opinion regarding ADA standards in determining whether the defendant negligently maintained an unsafe walkway); *Sorrels*, 796 F.3d at 1282-83. The record evidence includes Basulto's expert opinion that Defendant did not comply with industry standards in maintaining the HVAC system, which may have caused the a/c to become clogged and water to leak onto the floor. ECF No. [90] ¶¶ 33-39; ECF No. [92] ¶¶ 33-39; ECF No. [87-3] at 4; ECF No. [90] ¶ 19; ECF No. [92] ¶ 19. In addition, Defendant's Motion fails to consider that Defendant failed to respond to multiple pleas for help about the leaking water for approximately an hour. ECF No. [89] at 16. Accordingly, summary judgment as to Count I is denied.

Case No. 19-cv-24639-BLOOM/O'Sullivan

## IV. CONCLUSION

Accordingly, viewing the evidence in the light most favorable to Plaintiff, it is **ORDERED AND ADJUDGED** that Defendant's Motion, **ECF No. [82]**, is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on June 14, 2021.

*[signature]*

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record